**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL A. GUZMAN, | ) NO. ED CV 17-1190-E |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| NANCY A. BERRYHILL, Deputy | ) |
| Commissioner for Operations, | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**PROCEEDINGS**

Plaintiff filed a complaint on June 16, 2017, seeking review of the Commissioner's denial of disability benefits. The parties filed a consent to proceed before a United States Magistrate Judge on July 28, 2017. Plaintiff filed a motion for summary judgment on March 19, 2018. Defendant filed a motion for summary judgment on April 18, 2018. The Court has taken the motions under submission without oral argument. <u>See</u> L.R. 7-15; "Order," filed June 20, 2017.

///

Plaintiff, a 23 year old skateboarder with an 11th grade education, asserted disability since May 29, 2012 (the day before his 18th birthday), based on alleged anxiety, depression, anger, schizoaffective disorder and migraines (Administrative Record ("A.R.") 21, 38-39, 44, 69, 77-78, 249-60, 266, 442; but see A.R. 247-48 (application for child benefits dated May 17, 2012, reflecting that Plaintiff declined to file for "SSI" because he is not disabled)). Plaintiff stated and later testified that his asserted impairments cause him to have limitations that allegedly prevent him from working (A.R. 51-52).

An Administrative Law Judge ("ALJ") reviewed the medical record and heard testimony from Plaintiff and a vocational expert (A.R. 21-79). The ALJ found that Plaintiff suffers from severe schizoaffective disorder, bipolar disorder, mood disorder, a history of schizophrenia, paranoid type, and a history of post-traumatic stress disorder (A.R. 24). However, the ALJ also found that Plaintiff retains the residual functional capacity to perform work at all exertional levels with the following non-exertional limitations: (1) he can understand, remember and carry out simple job instructions; (2) he can maintain attention and concentration to perform simple, routine and repetitive tasks; (3) he can have occasional interaction with coworkers, supervisors and the public; (4) he can work in an environment with occasional changes to the work setting and with occasional work-related decision making. See A.R. 24-28 (adopting state agency physicians' residual functional ///

capacity assessments at A.R. 80-101).[1]  The ALJ determined that, with

such capacity, Plaintiff could perform medium work as a hand packager,

laundry laborer or industrial cleaner, and therefore is not disabled.

See A.R. 29-30 (adopting vocational expert testimony at A.R. 70-72).

The Appeals Council denied review (A.R. 1-3).


    In reaching his decision, the ALJ deemed Plaintiff's statements

and testimony concerning the severity of his alleged symptoms not

entirely credible (A.R. 26-28).  Plaintiff contends that the ALJ's

reasons for discounting Plaintiff's statements and testimony were not

legally sufficient.  See Plaintiff's Motion, pp. 1-10.


**STANDARD OF REVIEW**


    Under 42 U.S.C. section 405(g), this Court reviews the

Administration's decision to determine if: (1) the Administration's

findings are supported by substantial evidence; and (2) the

Administration used correct legal standards.  See Carmickle v.

Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); see also Brewes v.

Commissioner, 682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept

---

    [1]    The state agency physicians found Plaintiff would have
no significant limitation in: (1) carrying out short and simple
instructions; (2) performing activities within a schedule,
maintaining regular attendance, and being punctual within
customary tolerances; (3) sustaining an ordinary routine without
special supervision; (4) making simple work-related decisions;
(5) asking simple questions or requesting assistance; and (6)
maintaining socially appropriate behavior and adhering to basic
standards of neatness and cleanliness (A.R. 87-89, 98-100).  The
record contains no other medical evidence directly opining on
Plaintiff's work capacity.

as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (citation and quotations omitted); <u>see</u> <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may
> not substitute its judgment for that of the ALJ.  But the
> Commissioner's decision cannot be affirmed simply by
> isolating a specific quantum of supporting evidence.
> Rather, a court must consider the record as a whole,
> weighing both evidence that supports and evidence that
> detracts from the [administrative] conclusion.

<u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

**DISCUSSION**

After consideration of the record as a whole, Defendant's motion is granted and Plaintiff's motion is denied.  The Administration's findings are supported by substantial evidence and are free from material[2] legal error.  Plaintiff's contrary argument is unavailing.

**I.    <u>Summary of the Medical Record</u>**

The medical records are intermittent and somewhat sparse, with

---

[2]    The harmless error rule applies to the review of administrative decisions regarding disability.  <u>See</u> <u>Garcia v. Commissioner</u>, 768 F.3d 925, 932-33 (9th Cir. 2014); <u>McLeod v. Astrue</u>, 640 F.3d 881, 886-88 (9th Cir. 2011).

many of the records dating before the period of claimed disability. The first treatment notes are from Loma Linda University Behavioral Medicine Center for a hospital stay from January 19, 2011 through January 24, 2011 (A.R. 313-34). Plaintiff, who then was 16 years old, presented to the emergency room as "psychotic," destructive and belligerent, after an incident at home where he hit his brother-in-law in the jaw and raced through the house (A.R. 313, 315, 319). Plaintiff reportedly had a history of property destruction and assaultive behavior, struggled in school, and was stressed at home and at school (A.R. 315-16, 320). He also reportedly drank alcohol until he was drunk and used "THC" (marijuana) "all the time" (A.R. 315).

On mental status examination, Plaintiff reportedly had poor hygiene, was guarded, agitated, pacing, angry, avoided eye contact, had delusions of grandeur, had visual and auditory hallucinations, had aggressive thought content and had poor intellectual functioning (A.R. 317). He was diagnosed with psychosis, not otherwise specified, "alcohol and marijuana dependence versus abuse," and migraines, with a "severe" prognosis, and was assigned a Global Assessment of Functioning ("GAF") score of 25 (A.R. 318-19). See American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th Ed. 2000).[3] Plaintiff was

///

involuntarily admitted to the hospital as a danger to himself (A.R.

---

[3]     A GAF score of 21-30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV-TR, p. 34.

318, 320).

Plaintiff was prescribed Zyprexa for his psychosis and Depakote for mood stabilization, which reportedly helped Plaintiff become stable and stay calm (A.R. 320-21). At discharge on January 24, 2011, Plaintiff was given additional diagnoses of bipolar disorder and substance-induced psychotic disorder, and he was assigned a GAF of 38 (A.R. 319).[4] On mental status examination, there reportedly were no abnormalities, and his intellectual functioning, insight and judgment were "fair" (A.R. 321). Plaintiff was ordered to follow up with Victor Valley Behavioral Health Center, and was discharged with prescriptions for Cogentin, Zyprexa, and Depakote (A.R. 321-27).

Plaintiff followed up with the San Bernardino County Department of Behavioral Health (A.R. 335-47). A treatment note dated February 17, 2011, indicates diagnoses of schizoaffective disorder, post traumatic stress disorder (late onset), and chronic pain, with notes that Plaintiff was withdrawn, failing school and aggressive toward people around him (A.R. 335). Plaintiff reportedly had anger outbursts followed by blackouts, limited appetite, minimal sleep, was withdrawn, was having "premonitions" (i.e., flashes of images), believed he had special powers, was out of touch with reality, had no friends, and had some grief because his mother had cancer (A.R. 341).

---

[4]    A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR, p. 34.

Plaintiff was taking Cogentin, Zyprexa, and Depakote as prescribed (A.R. 341, 344). Plaintiff also admittedly was using marijuana to calm himself down (A.R. 341).

On mental status examination, Plaintiff reportedly was disheveled, cooperative with appropriate behavior, and he reportedly had tangential, clear and bizarre speech, average intellectual functioning, impaired memory, limited concentration and attention, delusional thinking ("I am God" and a belief that he had special powers), limited insight, poor judgment, dysphoric mood, flat affect, and he appeared to be having visual hallucinations (A.R. 345). Plaintiff was assigned a GAF of 41 (A.R. 335).[5]

Psychiatrist Dr. Maged Estafan evaluated Plaintiff on March 4, 2011 (A.R. 337-40). Plaintiff requested a change in his medications (A.R. 337). Plaintiff reportedly was confused and "unable to know what direction he is going to go" (A.R. 337). Plaintiff stated that he had been up for four days and had been seeing things just prior to the incident where he hit his brother-in-law and ended up in Loma Linda hospital (A.R. 337). Plaintiff reported that he had felt capable of hearing, seeing and telling the future, he was "very over confident" and omnipotent, had bizarre thoughts, and was in "a daze" with repetitive behavior and suicidal ideations (A.R. 337). <u>Plaintiff reported that he had not experienced any of these symptoms since being</u>

---

[5] A GAF score of 41-50 denotes "Serious symptoms (<u>e.g.</u>, suicidal ideation, severe obsessional rituals, frequent shoplifting), OR any serious impairment in social, occupational, or school functioning (<u>e.g.</u>, no friends, unable to keep a job)." DSM-IV-TR, p. 34.

placed on Depakote (A.R. 337).  Plaintiff was taking Seroquel,
Cogentin and Depakote as prescribed (A.R. 337).  Plaintiff also was
using cannabis (A.R. 338).

On mental status examination, Plaintiff reportedly had a
despondent mood and affect, spontaneous speech and thought processes
(i.e., "free flow speaking"), and "good" impulse control, calculation,
general fund of information, abstraction, insight and judgment (A.R.
338-39).  Dr. Estafan diagnosed bipolar disorder and cannabis abuse,
with noted problems of limited sociability and poor academics (A.R.
339).  Dr. Estafan assigned a GAF of 35-40 (A.R. 339).  Dr. Estafan
recommended that Plaintiff continue his Seroquel and Depakote and have
individual counseling (A.R. 340).

The next available medical records are from treatment by the Los
Angeles County Department of Mental Health in July of 2013 – over two
years later and after Plaintiff had applied for disability benefits
(A.R. 351-56).  On initial assessment on July 3, 2013, Plaintiff
complained of daily depression, insomnia, nightmares, poor appetite,
anxiety, poor concentration, racing thoughts, mood swings, anger,
outbursts, avoidance, paranoia, low self esteem, helplessness,
hopelessness, audio and visual hallucinations, and stress due to his
legal situation of being on probation and having to attend domestic
violence classes (A.R. 351, 358).  Plaintiff was on probation after
having hit and choked his girlfriend in March of 2013 (A.R. 353).
Plaintiff reported histories of: (1) rage with blackouts ("I used to
have a v. bad anger problem before"); (2) two suicide attempts when he
was 16 years old; (3) head trauma from being hit by a car three times

when he was riding his bicycle at the ages of 5, 7, and 8; (4) physical abuse by his father; (5) sexual abuse for several months by a male when he was 10 and 11 years old; and (6) being bullied when he was in grade school (A.R. 351-53).

On mental status examination, Plaintiff reportedly had impaired remote memory, concentration, judgment and insight, his fund of knowledge was below average, his mood was dysphoric, he appeared to have auditory hallucinations and he was isolated (A.R. 354). Plaintiff was diagnosed with a mood disorder, not otherwise specified, with a note to rule out bipolar disorder with psychotic features, and he was assigned a GAF of 45. See A.R. 355 (assessment completed by a licensed clinical social worker and cosigned by a psychologist).

On July 25, 2013, Plaintiff presented for an initial psychiatric evaluation by a doctor whose name is not legible (A.R. 359). Plaintiff complained of depression, a bad temper and poor social skills (A.R. 359). Plaintiff reported that he had been hospitalized after choking his girlfriend for criticizing him (A.R. 359). On examination, Plaintiff reportedly was alert, oriented, neat, calm and coherent, he reported auditory hallucinations (supposedly whispering "Michael come here") and his memory and judgment were "fair" (A.R. 359). The doctor diagnosed a mood disorder (A.R. 359). Plaintiff was prescribed Zyprexa (an antipsychotic), Inderal (an antidepressant), and Benadryl (A.R. 356-57, 359). Plaintiff was to return in 30 days (A.R. 359).

The next treatment note is from October 2, 2013, when Plaintiff

presented to the same doctor for a medication follow up (A.R. 360).
Plaintiff reported benefitting from his medications (A.R. 360).
Plaintiff said he was "unsure" of his new stepmother (A.R. 360).  On
examination, Plaintiff reportedly was alert, neat, coherent, tense,
with no violent thought, and his memory and judgment were "fair" (A.R.
360).  Plaintiff's medications were continued (A.R. 360).  There are
no other treatment notes from this provider in the record.

The next available medical records are from a psychiatric
hospital stay at College Hospital from December 24, 2013, through
January 2, 2014 (A.R. 366-84).  Plaintiff presented with claimed
features of psychosis (_i.e._, auditory hallucinations, thought
disorganization and difficulty articulating any reasonable plan of
self-care) (A.R. 367, 369).  Plaintiff reportedly had been abusing
cannabis regularly and admitted he had used cocaine more than a year
before (A.R. 369).  Plaintiff denied having any "legal" history (A.R.
369).  Plaintiff reportedly appeared "intrusive," disheveled,
malodorous, and was pacing and jumping up and down saying he was
getting ready for the apocalypse and that he needed to save the world
(A.R. 369).  On mental status examination, Plaintiff reportedly had
fair eye contact, spontaneous speech, an anxious and irritable mood,
inappropriate affect, disorganized thought processes, internal
preoccupation and paranoia, and impaired insight and judgment (A.R.
///
///
///
///
369).  Plaintiff was diagnosed with "paranoid schizophrenia

10

exacerbation," and was assigned a GAF at admission of 20 (A.R. 369).[6]

Plaintiff reportedly had a history of "intermittent" contact with mental care providers and previous use of psychotropic medications. See A.R. 367; see also A.R. 377 (medication list indicating Plaintiff had taken Zyprexa, Benadryl, and Popranolol, but when he had his last dose was "unknown"). During his hospital stay, Plaintiff was prescribed Latuda and Depakote, which helped him interact more readily with others, made his thought processes more organized and coherent, and lessened Plaintiff's response to internal stimuli or fixation on thoughts of self harm (A.R. 367, 370, 374). On discharge, Plaintiff reportedly was "very cooperative and future-oriented," his thought processes were oriented and coherent, he denied suicidal or homicidal ideation, and he appeared appropriate for transition to a lower level of care (A.R. 367). Plaintiff was diagnosed with schizophrenia, paranoid type, with a "fair" prognosis, and assigned a GAF of 40-42 (A.R. 367, 374). Plaintiff was discharged with a supply of Latuda and Depakote (A.R. 367, 374-75). Plaintiff was encouraged to follow up with outpatient services (A.R. 368).

On January 3, 2013, Plaintiff presented to Dr. Clint Salo with College Hospital for follow up in the "partial program for ongoing care" (A.R. 383-84). Plaintiff reported that his insurance would not

---

[6] On physical examination, Plaintiff reportedly said he wanted to kill himself and that he had been having suicidal ideation with plans to cut or overdose (A.R. 371). Plaintiff reportedly had been increasingly anxious and paranoid, and complained of having a headache (A.R. 371). Plaintiff was assessed with a tension headache and permitted to have Tylenol as needed (A.R. 372-73).

approve the medication he had been prescribed and that he could not afford it (A.R. 383).  Plaintiff reportedly exhibited some paranoia (e.g., he thought his father may be associated with "the FBI" because his father monitors him) and "some simplification" in his thought process, but Plaintiff reportedly was not experiencing any hallucinations (A.R. 383).  Plaintiff denied any pertinent psychiatric history in his immediate family (A.R. 383).  Plaintiff indicated that he was in the process of applying for Social Security benefits (A.R. 383).

On mental status examination, Plaintiff reportedly was alert and oriented, a "little bit guarded," with an "okay" mood, somewhat restricted affect, somewhat limited judgment and insight, simplified thought process, some evidence of ongoing paranoid ideation, no evidence of current suicidal or homicidal ideation, he was not observed responding to stimuli, and his fund of knowledge appeared average (A.R. 383).  Dr. Salo diagnosed schizophrenia, paranoid type, and assessed a GAF of 40 (A.R. 384).  Dr. Salo continued Plaintiff's Depakote, discontinued Latuda because it was not covered by insurance, and prescribed Geodon to help with Plaintiff's psychosis (A.R. 384).  There are no other treatment notes from Dr. Salo in the record.

The next available medical records are for psychiatrist Dr. Herbert Sim-on Chin from April of 2014 through July of 2014 (A.R. 425-29).  Plaintiff presented for an evaluation on April 26, 2014, reporting he had been on probation since March of 2013 for assaulting his girlfriend (A.R. 427).  Plaintiff was taking Depakote (A.R. 427).  Plaintiff admitted a history of using alcohol, cocaine and marijuana

(A.R. 428).  Dr. Chin diagnosed schizoaffective disorder and bipolar disorder (A.R. 429).

Plaintiff returned on June 6, 2014, reporting that his appetite was fair, his sleep pattern had not improved, and he had anxiety, depression and mood swings (A.R. 429).  Plaintiff reportedly was taking his medication as directed (A.R. 426).  Dr. Chin indicated Plaintiff's progress was "unsatisfactory" (A.R. 426).  Dr. Chin gave a "guarded" prognosis and indicated Plaintiff's condition had not improved (A.R. 426).  Although Plaintiff previously was reported as taking Depakote with no indication in the record that any other prescriptions were given (A.R. 427), Dr. Chin listed Plaintiff's medications as Prazozim, Popranolol, Visteril, Geodon, Depakote, and Wellbutrin (A.R. 426).[7]

On follow up on July 4, 2014, Plaintiff reportedly was feeling better and his medication was helpful (A.R. 425).  Plaintiff's mood swings reportedly were stable, he was taking his medications as directed, and his progress was "satisfactory" (A.R. 425).  Dr. Chin again gave a "guarded" prognosis, but indicated Plaintiff's condition was stable (A.R. 425).  Dr. Chin continued Plaintiff's medications (which are unspecified) and ordered Plaintiff to return in four weeks (A.R. 425).  There are no other treatment notes from Dr. Chin in the record.

///

The next available record is an "Adult Short Assessment" form

---

[7]    The record is not clear regarding whether Plaintiff then was taking some or all of these medications.

completed by Dr. Crespo, a licensed clinical social worker, dated June
10, 2015 – almost one year later (A.R. 444-46). Plaintiff presented
to request counseling to help with depression (A.R. 446). Plaintiff
reportedly had been under the care of a psychiatrist who had
prescribed Seroquel, but Plaintiff had discontinued psychiatric
treatment (A.R. 446). Plaintiff was referred to get a list of
psychiatrists from his insurance company to resume treatment (A.R.
446). Plaintiff claimed that he could not maintain consistent
employment due to his psychiatric diagnosis and the side effects of
his psychotropic medications, and said he spends most of his time
skating (A.R. 445). On mental status examination, Plaintiff
reportedly was disheveled, restless, had a "below average" fund of
knowledge, with an anxious mood, sad affect, concrete abstractions,
"moderately" impaired judgment, claimed visual and auditory
hallucinations, supposed behavior disturbance (i.e., being self-
destructive with poor impulse control), and he was "amotivational"
(A.R. 446).

Psychiatrist Dr. Bruce Marquez treated Plaintiff from July of
2015 through at least August of 2015 (A.R. 430-42). Plaintiff
presented for a new patient evaluation on July 14, 2015 (A.R. 433-42).
Plaintiff listed "skateboarder" as his occupation (A.R. 442).
Plaintiff reportedly wanted to find out if his medications were right
for him and said that his medications "don't feel right" (A.R. 436,
442). Plaintiff reportedly was taking Popranolol, Hydroxyzine,
Divalprox, Prazosine, and Ziprazodone (A.R. 437, 441). Plaintiff
reported that he drank beer or wine occasionally but claimed he used
no other drugs (A.R. 439). Plaintiff complained of gastrointestinal

pain, headaches, chronic nausea and chronic leg pain, with a history of three concussions (A.R. 438). Plaintiff reportedly said he was trying to get disability benefits (A.R. 439).

On mental status examination, Plaintiff reportedly had a depressed mood and was experiencing audio and visual hallucinations (A.R. 435). Dr. Marquez diagnosed bipolar disorder, type II (A.R. 434). Dr. Marquez discontinued Plaintiff's Popranolol, Ziprazodone, and Hydroxyzine, and prescribed Seroquel, Neurontin, and Zolpidem (A.R. 433). Dr. Marquez did not refer Plaintiff for therapy (A.R. 433).

Plaintiff returned to Dr. Marquez on August 27, 2015, reporting that he was "doing okay today" (A.R. 430). Plaintiff said he liked the dose/effect of Seroquel and said that he "[felt] much better" (A.R. 430). Plaintiff also reported that the Neurontin was helpful and that he was sleeping "ok" (A.R. 430). Plaintiff reportedly had to be out of the house from 6 a.m. until 9 p.m. because he did not get along with his stepmother (A.R. 430). Dr. Marquez indicated that Plaintiff was compliant with and responding to his medications, had no side effects, was eating well, sleeping well and had no suicidal or homicidal ideations (A.R. 430). Dr. Marquez also indicated there was no need to adjust Plaintiff's medications (A.R. 430). Again, Dr. Marquez did not refer Plaintiff for therapy (A.R. 430).

///

///

///

**II.   Substantial Evidence Supports the Conclusion that Plaintiff Can**

**Work.**

Substantial evidence supports the administrative conclusion that Plaintiff can work. The state agency physicians reviewed the record and found Plaintiff capable of maintaining persistence, pace, and attention for at least simple tasks and/or routines when he is compliant with medication, and capable of performing tasks with moderate exposure to public and others (A.R. 80-103). Where, as here, the opinions of a non-examining physicians do not contradict "all other evidence in the record," the opinions may furnish substantial evidence to support the administrative decision. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted); see also Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (opinion of non-examining medical expert "may constitute substantial evidence when it is consistent with other independent evidence in the record") (citation omitted). Significantly, no physician opined during the period of claimed disability that Plaintiff was totally disabled from all employment. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993); Curry v. Sullivan, 925 F.2d 1127, 1130 n.1 (9th Cir. 1990). Furthermore, Plaintiff's own admissions of extensive activities (discussed infra) demonstrate that he retains the capacity to work, at least when he is medicated appropriately.

To the extent the evidence of record is conflicting, the ALJ properly resolved the conflicts. See Treichler v. Commissioner, 775 F.3d 1090, 1098 (9th Cir. 2014) (court "leaves it to the ALJ" to resolve conflicts and ambiguities in the record); Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995) (court must uphold the

administrative decision when the evidence "is susceptible to more than one rational interpretation").

The vocational expert testified that a person with the residual functional capacity the ALJ found to exist could perform medium jobs existing in significant numbers (A.R. 70-72). The ALJ properly relied on this testimony in denying disability benefits. See Barker v. Secretary, 882 F.2d 1474, 1478-80 (9th Cir. 1989); Martinez v. Heckler, 807 F.2d 771, 774-75 (9th Cir. 1986).

**III. The ALJ Stated Sufficient Reasons for Finding Plaintiff's Statements and Testimony Less Than Fully Credible.**

Plaintiff challenges the sufficiency of the ALJ's reasons for finding Plaintiff's statements and testimony not entirely credible. See Plaintiff's Motion, pp. 1-10. An ALJ's assessment of a claimant's credibility is entitled to "great weight." Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir. 1990); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985). Where, as here, an ALJ finds that a claimant's medically determinable impairments reasonably could be expected to cause some degree of the alleged symptoms of which the claimant subjectively complains, any discounting of the claimant's complaints must be supported by specific, cogent findings. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); but see Smolen v. Chater, 80 F.3d 1273, 1282-84 (9th Cir. 1996) (indicating that ALJ must offer "specific, clear and convincing" reasons to reject a claimant's testimony where there is no

evidence of malingering).[8] An ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." See Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal citations and quotations omitted); see also Social Security Ruling 96-7p (explaining how to assess a claimant's credibility), superseded, Social Security Ruling 16-3p (eff. Mar. 28, 2016).[9] As discussed below, the ALJ stated sufficient reasons for deeming Plaintiff's subjective complaints less than fully credible.

A.  **Summary of Plaintiff's Testimony and Statements**

At the hearing on September 14, 2015, Plaintiff testified that he

---

[8]  In the absence of an ALJ's reliance on evidence of "malingering," most recent Ninth Circuit cases have applied the "clear and convincing" standard. See, e.g., Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015); Burrell v. Colvin, 775 F.3d 1133, 1136-37 (9th Cir. 2014); Treichler v. Commissioner, 775 F.3d 1090, 1102 (9th Cir. 2014); Ghanim v. Colvin, 763 F.3d 1154, 1163 n.9 (9th Cir. 2014); Garrison v. Colvin, 759 F.3d 995, 1014-15 & n.18 (9th Cir. 2014); see also Ballard v. Apfel, 2000 WL 1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier cases). In the present case, the ALJ's findings are sufficient under either standard, so the distinction between the two standards (if any) is academic.

[9]  Social Security Rulings ("SSRs") are binding on the Administration. See Terry v. Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990). The appropriate analysis in the present case would be substantially the same under either SSR. See R.P. v. Colvin, 2016 WL 7042259, at *9 n.7 (E.D. Cal. Dec. 5, 2016) (observing that only the Seventh Circuit has issued a published decision applying SSR 16-3p retroactively; also stating that SSR 16-3p "implemented a change in diction rather than substance") (citations omitted); see also Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (suggesting that SSR 16-3p "makes clear what our precedent already required").

had been living at home with his father and stepmother for the past two years since he was placed on probation for domestic violence against his girlfriend (A.R. 39, 48). While on probation, Plaintiff had completed 180 days of community service work by picking up trash at a park and cleaning a lake two days a week with up to 40 other people (A.R. 40-41).[10] Plaintiff said he had no problems performing his community service, apart from supposedly feeling awkward socializing with others, arriving late once, and having one incident where Plaintiff argued angrily with one of the park rangers (for which Plaintiff later apologized) (A.R. 40-43). Plaintiff also attended weekly behavior classes for a year along with 13 other students (A.R. 42-43). Plaintiff said he had no problems in the class (A.R. 43).

Plaintiff then was seeing a psychiatrist monthly, a therapist weekly, and taking Popranolol, Seroquel and two other medications that he could not remember (A.R. 44, 50-51, 66-68). Plaintiff said he has anxiety, depression because his mother passed away, his home situation

/// 

/// 

/// 

/// 

---

[10]    The record is missing a page from the transcript of Plaintiff's administrative hearing. See A.R. 40-41 (skipping page 6 of the transcript). This omission does not appear to be material. See Brady v. Apfel, 41 F. Supp. 2d 659, 668-69 (E.D. Tex. Mar. 19, 1999) (rejecting the notion that an incomplete administrative record constitutes a per se denial of due process; "[i]nstead, the touchstone is whether the administrative record that does exist permits meaningful appellate review"); accord Edwards v. Astrue, 2010 WL 2787847, at *4 (D. Kan. June 30, 2010), adopted, 2010 WL 2787833 (D. Kan. July 15, 2010).

"is not very good" and he feels overwhelmed (A.R. 46-47).[11]  Plaintiff

said when he does not take his medication he is "very not calm."  See

A.R. 47; see also A.R. 263 (Plaintiff reporting in April of 2013 that

he supposedly gets into trouble when he is not taking his

medications).  Plaintiff reportedly was not taking his medications at

the time of his domestic violence incident (A.R. 49).


     Plaintiff testified that his medication, psychiatric treatment

and classes helped him a "great deal."  See A.R. 49-50; see also A.R.

300 (Plaintiff reporting in June of 2014 that he "[felt] confident

that the meds. are helping a lot" with his mental condition).

Plaintiff claimed he was taking his medication when he had the

argument with the park ranger and when he was taking his behavior

class (A.R. 47).  Plaintiff said the last time he had been violent was

three months before the hearing, when he and a friend supposedly got

into an altercation (A.R. 49).  Plaintiff said that, when he is on his

---

[11]     In a Pain Questionnaire dated June 1, 2013, Plaintiff
reported that he: (1) gets headaches when he is stressed; (2) has
paranoia, depression and anger; (3) has problems getting along
with others because he feels unloved; (4) has problems
controlling his anger; (5) does not get along with authority
figures very well; (6) does not handle stress very well; and (7)
does not like changes in routine (A.R. 272-79).  Plaintiff claims
that he blacks out when he gets angry, stresses easily, gets
angry quickly, is depressed frequently and feels worthless (A.R.
279).  Plaintiff asserted that his conditions affect squatting,
bending, kneeling, seeing, memory, completing tasks,
concentration, understanding, following instructions, and getting
along with others.  See A.R. 274 (emphasis added).  Plaintiff
stated that he could walk two miles before needing to rest 10
minutes, could pay attention for 40 minutes at a time, does not
finish what he starts, gets confused sometimes following written
instructions, but easily follows spoken instructions when told
how to do something three or more times (A.R. 274-75).  Plaintiff
admitted he is able to skateboard almost every day with others at
skate parks, ride a bicycle, shop in stores, prepare his own
meals, and do daily housework (A.R. 275-77).

medication, he is "very mellow, calm, cool, and collected, but it's hard for [him] to like kind of like speak and express [himself]" (A.R. 47-48). He stated he is more in his head "instead of like trying to be auditory." <u>See</u> A.R. 47; <u>but see</u> A.R. 57 (Plaintiff testifying that his medication makes it "a lot easier to be able to talk to people"). Plaintiff said that during the last two years he had been consistent and regimented with taking his medications by using phone reminders (A.R. 52).[12]

On examination by Plaintiff's attorney, Plaintiff claimed that his medications do not take away all of his problems (A.R. 59). Plaintiff claimed he still has hallucinations like "creepy voices" telling him to do bad things, but his purported hallucinations are now easier to ignore (A.R. 59-61). Plaintiff alleged that his medications make it harder for him to eat (A.R. 61). He said that he drinks energy drinks so as not to feel tired, and claimed that sometimes the medications make it harder for him to think (A.R. 61-62). He also claimed that he still has the urge to hit someone or get into an altercation while on his medication, but he also said he walks away to remove himself from the trigger and admitted he is better with medication (A.R. 63-65). Plaintiff said it takes him about 15 minutes to calm himself (A.R. 65).

///

___

[12]  Plaintiff admitted a history of using marijuana on a regular basis, drinking alcohol and using cocaine (A.R. 49-50). Plaintiff said he still drank alcohol occasionally, but said he was staying away from "all the drugs" because he was on probation (A.R. 50).

With regard to Plaintiff's claim that he could not work because
of his medications, Plaintiff stated:  "They said [] that I'm a risk.
I have always came straightforward [sic] when I. . . try to get a
job[,] and they [end] up shooting me down because of the fact that I'm
taking medication."  See A.R. 51; see also A.R. 301 (Plaintiff
reporting no work history as of June of 2014, supposedly because he is
"High Risk").  When asked whether he could perform work if he were
hired, Plaintiff said the biggest issue would be getting to a job
because he cannot get a driver's license due to his medications (A.R.
51-52).  Plaintiff said that, if the task were simple, he could try
his best to do what he could but he claimed he has a problem with
"constantly" forgetting (A.R. 52).  Plaintiff admitted that in the
first quarter of 2015 he had earnings because he was trying to get a
job, and that he worked for a total of about a month through a
temporary agency at six different jobs.  See A.R. 69-70; see also A.R.
259 (record of earnings for temporary work).  Plaintiff said that he
had problems at his temporary jobs staying within his schedule of
taking Popranolol every two to three hours or as needed (A.R. 74).
Plaintiff claimed he was fired because he needed to take Propranolol
to deal with his frustration with the people around him (A.R. 74-75).

Plaintiff testified that he likes to skateboard, draw, listen to
music, and "hang out" with his two children, who were five and three
years old and lived with their mother in Apple Valley (A.R. 52-54).
Plaintiff said he gets to and from Apple Valley from Los Angeles
(where he lives) either by having his father drive him, his girlfriend
pick him up, or by taking a Greyhound bus (A.R. 53).  He had been to
Apple Valley to see his children four or five times in the past year,

visiting for one or two weeks at a time, and he sometimes watches the children by himself (A.R. 53-54).

Plaintiff said he skateboards every day or every other day at a skate park in Pico Rivera (A.R. 54). Plaintiff said he spends his days taking his medication, cleaning the house, eating a meal, taking a bus to a stop, and riding his skateboard from the stop to the skate park where he skateboards for as long as he can (A.R. 55). Plaintiff can take the bus from skate park to skate park where he sees his friends (A.R. 56). Plaintiff said it is difficult for him to stay at his house because his stepmother only lets him spend the night there (i.e., he must be out of the house during the day) (A.R. 55-56). Plaintiff said the biggest stressor in his life was his living situation, and said that, if that situation got resolved, 75 percent of his stress would be gone (A.R. 56-57). Plaintiff reportedly cannot live with his girlfriend while he is on probation (A.R. 57).

### B. The ALJ's Reasoning is Legally Sufficient.

The ALJ acknowledged that Plaintiff's impairments limit certain aspects of his functioning, but found "no evidence establishing the impairments are so severe as to prevent the claimant from basic work activities" (A.R. 26). The ALJ reasoned that: (1) the objective evidence does not support the claimant's allegations of severity (e.g., the record showed "minimal treatment" and that Plaintiff's symptoms are adequately controlled and stable when he is compliant with medication); (2) Plaintiff has a "wide range of daily activities," and his ability to participate in such activities

diminished the credibility of Plaintiff's allegations of functional

limitations; and (3) during the hearing, the ALJ observed that

Plaintiff was able to follow questions posed and answer the questions

appropriately, without difficulty or undue delay, and Plaintiff was

able to pay attention throughout the entire hearing (A.R. 26-28).

///

///

        An ALJ permissibly may rely on a lack of objective medical

evidence fully supporting the alleged severity of a claimant's

symptomatology to discount a claimant's testimony and statements.  See

Burch v. Barnhart, 400 F.3d 676, 681 (2005) ("Although lack of medical

evidence cannot form the sole basis for discounting pain testimony, it

is a factor the ALJ can consider in his credibility analysis.");

Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (same); see

also Carmickle v. Commissioner, 533 F.3d at 1161 ("Contradiction with

the medical record is a sufficient basis for rejecting the claimant's

subjective testimony.") (citation omitted); SSR 16-3p, 2016 WL

1119029, at *4 ("[O]bjective medical evidence is a useful indicator to

help make reasonable conclusions about the intensity and persistence

of symptoms, including the effects those symptoms may have on the

ability to perform work-related activities . . ."); SSR 96-7p, 1996 WL

374186, at *6 ("[O]bjective medical evidence is a useful indicator to

assist us in making reasonable conclusions about the intensity and

persistence of an individual's symptoms and the effects those symptoms

may have on an individual's ability to function.") (citation and

internal quotation marks omitted).

///

///

In the present case, as summarized above (and as discussed by the ALJ at A.R. 27), although Plaintiff had been diagnosed with schizoaffective disorder, bipolar disorder, and a mood disorder, and Plaintiff was aware of these diagnoses, he sought minimal treatment and he discontinued treatment for lengthy periods of time despite reported improvement. An ALJ may discount a claimant's allegations based on a claimant's failure to seek treatment or to follow a prescribed course of treatment. See Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (in assessing a claimant's credibility the ALJ may properly rely on "unexplained or inadequately explained failure to seek treatment or to follow prescribed course of treatment") (citations and internal quotation marks omitted); see also SSR 16-3p at *9 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages or changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent. ¶ In contrast, if the frequency or extent of the treatment sought. . . is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."); SSR 96-7p, 1996 WL 374186, at *7 ("[Claimant's] statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints[.]"). The ALJ did not err in considering Plaintiff's failure consistently to seek treatment and take his medications. See, e.g., Tadman v. Berryhill, 2017 WL 1073341, at *5-6 (C.D. Cal. Mar.

21, 2017) (finding ALJ did not err in considering sporadic nature of
claimant's mental health treatment after receiving a diagnosis for a
mental health impairment; distinguishing Nguyen v. Chater, 100 F.3d
1462, 1465 (9th Cir. 1996));[13] Lucker-McVae v. Commissioner, 2013 WL
712276, at *6 (D. Or. Feb. 27, 2013) (same where claimant did not seek
consistent mental health treatment until the year she filed her social
security applications); Beasley v. Astrue, 2010 WL 4717108, at *5 &
n.1 (E.D. Wash. Nov. 15, 2010) (same where claimant had been advised
to seek mental health treatment for diagnosed mental illness but did
not follow recommendations for a two-year period); Judge v. Astrue,
2010 WL 3245813, at *4 (C.D. Cal. Aug. 16, 2010) (same where claimant
underwent bi-weekly therapy to address trauma for a finite period of
time but thereafter did not get any treatment, which "seems more a
function of the fact that she did not need it, as opposed to her
inability to comprehend that she needed it"); Parks v. Astrue, 2010 WL
424609, at *8 (E.D. Wash. Jan. 29, 2010) (same where claimant failed
to keep mental health appointments after referral and was familiar
with psychotropic treatment for her condition).

    As summarized above (and by the ALJ at A.R. 26-28), the medical
evidence showed that Plaintiff's symptoms were largely controlled when
he took his medication.  The ALJ did not err in citing the efficacy of
Plaintiff's medications and treatment in discounting Plaintiff's

---

        [13]    In Nguyen, the Ninth Circuit found it "questionable" to
"chastise" one with a mental impairment for failure to seek
psychiatric treatment, where the claimant had neither sought nor
received any mental health treatment.  Nguyen, 100 F.3d at 1465.
Unlike Nguyen, Plaintiff is not someone who failed to "recognize
that [his] condition reflects a potentially serious mental
illness." Id. Plaintiff is well aware of his mental condition and
of the benefits of regular treatment.

subjective complaints.  See Warre v. Commissioner, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.") (citations omitted).

The ALJ also permissibly cited Plaintiff's ability to concentrate and to answer questions appropriately at the hearing (A.R. 28).  See Drouin v. Sullivan, 966 F.2d 1255, 1259 (9th Cir. 1992) (ALJ's observation of claimant at hearing permissible where such observation was one of several factors affecting credibility determination); see also Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (although Ninth Circuit has disapproved of so-called "sit and squirm" jurisprudence, the inclusion of the ALJ's observations does not render the decision improper; ALJ did not comment on fact that claimant failed to manifest symptoms of pain at the hearing, but rather on the claimant's symptoms that were inconsistent with the medical record and with other behavior exhibited at the hearing) (citing Morgan v. Commissioner, 169 F.3d 595, 600 (9th Cir. 1999)).  Here, the ALJ accounted for any mental limitations Plaintiff may have (when Plaintiff is compliant with his medications) by limiting Plaintiff to simple, routine and repetitive tasks with occasional interaction with others, with occasional changes in the work setting and occasional work-related decisions, consistent with the state agency physician opinions and with Plaintiff's own testimony.  See A.R. 25-28; compare A.R. 87-89, 98-100 (state agency physicians' opinions); and A.R. 51-52, 55 (Plaintiff testifying at the hearing that his biggest hurdle to working would be getting to the job site because he does not have a driver's license, but admitting that he takes daily public

transportation to skate parks and that he could "try [his] best" to do simple tasks).

Assuming, _arguendo_, that the ALJ's reliance on his own observations of Plaintiff at the hearing to discount Plaintiff's subjective complaints was improper, the Court nevertheless upholds the ALJ's determination.  Under _Carmickle v. Commissioner_, 533 F.3d at 1163, the infirmity of one or two supporting reasons for an ALJ's determination regarding subjective symptoms does not require overturning the determination if independently valid supporting reasons remain.  Here, the ALJ properly relied on inconsistencies between Plaintiff's subjective complaints and his admitted daily activities.  For example, Plaintiff claimed to be limited in squatting, bending, kneeling, seeing, and getting along with others (A.R. 274).  Yet, he skateboards all day with others and had few or no problems completing his community service and required classwork (A.R. 40-42).  As summarized above (and by the ALJ at A.R. 26-27), Plaintiff previously attended classes, previously performed community service, is out of the house all day every day, goes to skate parks daily, takes public transportation, spends time with his friends and girlfriend and spends time with and cares for his young children.  He also sought work previously.  Such inconsistencies between admitted activities and claimed incapacity properly may impugn the accuracy of Plaintiff's testimony and statements under the circumstances of this case.  _See Molina v. Astrue_, 674 F.3d at 1112 (ALJ properly discredited allegations that claimant could not tolerate minimal human interaction where daily activities included walking grandchildren to and from school, attending church, shopping, and taking walks); _Thune_

28

v. Astrue, 499 Fed. App'x 701, 703 (9th Cir. 2012) (ALJ properly discredited pain allegations as contradicting claimant's testimony that she gardened, cleaned, cooked, and ran errands); Bray v. Commissioner, 554 F.3d 1219, 1227 (9th Cir. 2009) (fact that claimant has sought out employment weighs against a finding of disability); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) (claimant's "normal activities of daily living, including cooking, house cleaning, doing laundry, and helping her husband in managing finances" was sufficient explanation for discounting claimant's testimony).

The lack of objective medical evidence suggesting greater limitations and the fact that Plaintiff could engage in significant daily activities consistent with an ability to do work are independently valid reasons for discounting Plaintiff's testimony and statements. Accordingly, the ALJ stated sufficient reasons to allow this Court to conclude that the Administration discounted Plaintiff's testimony and statements on permissible grounds. See Moisa v. Barnhart, 367 F.3d at 885. The Court therefore defers to the ALJ's determination. See Lasich v. Astrue, 252 Fed. App'x 823, 825 (9th Cir. 2007) (court will defer to Administration's credibility determination when the proper process is used and proper reasons for

///

///

///

///

///

the decision are provided); accord Flaten v. Secretary of Health &

Human Services, 44 F.3d 1453, 1464 (9h Cir. 1995).[14]

## CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: June 6, 2018

_____
            /s/
        CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

---

[14] The Court should not and does not determine de novo the accuracy of Plaintiff's testimony and statements concerning his subjective symptomatology. It is for the Administration, and not this Court, to evaluate the accuracy of Plaintiff's testimony and statements regarding the intensity and persistence of Plaintiff's subjective symptomatology. See Magallanes v. Bowen, 881 F.2d 747, 750, 755-56 (9th Cir. 1989).